UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

TIMOTHY SMITH,

                         Plaintiff,

v.                                                      3:17-CV-0286
                                                        (GTS/ML)
JOHN TKACH; TICIA EAVES; TRACI
ZIEGENHAGEN; KATRINA TOKOS; JULIA
HEPWORTH; JESSICA LAYMAN; SUSAN
PATTERSON; MARISSA CARTER; KATHLEEN
SANTONI; JOHN CHOYNOWSKI; JON
PETERSON; and BIRKSHIRE FARM CENTER,

                         Defendants.
_____

APPEARANCES:                                            OF COUNSEL:

TIMOTHY SMITH
   Plaintiff, *Pro Se*
6 Main Street Terrace, Apt. 2A
Johnson City, NY 13790

BROOME COUNTY ATTORNEY'S OFFICE                         CHERYL D. SULLIVAN, ESQ.
   Counsel for DSS Defendants
Broome County Office Building
60 Hawley Street, P.O. Box 1766
Binghamton, NY 13902-1766

GIRVIN & FERLAZZO, P.C.                                 PATRICK J. FITZGERALD III, ESQ.
   Counsel for Birkshire Defendants
20 Corporate Woods Boulevard
Albany, NY 12211-2350

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this *pro se* civil rights action filed by Timothy Smith

("Plaintiff") against Birkshire Farm Center and Ticia Eaves ("Berkshire Defendants"), and John

Tkach, Traci Ziegenhagen, Katrina Tokos, Julia Hepworth, Jessica Layman, Susan Patterson, Marissa Carter, Kathleen Santoni, John Choynowski, and Jon Peterson ("DSS Defendants"), are the following two motions: (1) the Birkshire Defendants' motion for summary judgment; and (2) the DSS Defendants' motion for summary judgment.  (Dkt. Nos. 50, 51.)  For the reasons set forth below, the Birkshire Defendants' motion is granted and the DSS Defendants' motion is granted.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Amended Complaint

Generally, in his Amended Complaint, Plaintiff explicitly asserts two causes of action.[1] (Dkt. No. 5 [Pl.'s Am. Compl.].)  First, Plaintiff claims that Defendants violated his Fourth Amendment rights by (a) wrongfully taking three of his children from his custody and placing them in foster care, and (b) making false allegations and statements against him that have led the Broome County Family Court to deny his efforts to have his children returned to him or to a family member.  (*Id.*)

Second, Plaintiff claims that Defendants violated his Fourteenth Amendment rights by wrongfully continuing to withhold his children from him.  (*Id.*)  Plaintiff also claims that Defendant Berkshire Farms is allowing his children to be abused in foster care.  (*Id.*)

In addition to these explicit claims, Plaintiff also appears to assert a claim pursuant to 42 U.S.C. § 1985 in that he indicated on his Amended Complaint that his claims arise under both that section and 42 U.S.C. § 1983.  (*Id.* at ¶ 1.)  Plaintiff additionally alleges that he suffered

---

[1]    The Court notes that a third explicit cause of action under the Fifth Amendment was previously dismissed.  (Dkt. No. 11 [Decision and Order filed Aug. 30, 2017].)

2

"sever[e] mental depression, mental distress and mental anguish" as the result of Defendants'

actions, suggesting that he possibly also intends to assert a claim for intentional or negligent

infliction of emotional distress under New York common law. (*Id.* at 13.)

Lastly, Plaintiff states as part of his discussion of the case that Defendants' actions are "a

violation of [the] 1[st], 4th . . . 8th and 14th Amendments." (*Id.* at 11.)[2]

## B.  Undisputed Material Facts on the Birkshire Defendants' Motion for Summary Judgment

Unless otherwise noted, the following facts were asserted and supported with accurate

record citations by the Birkshire Defendants in their Statement of Material Facts and expressly

admitted by Plaintiff in his response thereto or denied without appropriate record citations

supporting his denial. (*Compare* Dkt. No. 50, Attach. 2 [Berkshire Defs.' Rule 7.1 Statement]

*with* Dkt. No. 54, Attach. 1 [Pl.'s Rule 7.1 Resp.].)

1.  Plaintiff's three children at issue in this case are Ar S, born in 2012, Am S, born in

2013, and Ay S, born in 2014.

2.  The children's mother is Justine Crowley.

3.  Plaintiff met Crowley in 2011 and lived with her in several locations over the

---

[2]  The Court notes that, in performing a preliminary review of Plaintiff's Amended Complaint, Magistrate Judge Peebles found that Plaintiff has asserted claims under the 4th, 5th, and 14th Amendments and recommended that only the 5th Amendment claim be dismissed, a finding that was adopted by this Court. (Dkt. No. 7 [Report and Recommendation filed July 13, 2017]; Dkt. No. 11 [Decision and Order filed Aug. 30, 2017].) However, the Court finds that it should nonetheless consider the additional claims discussed above (i.e., the apparent claims under the First Amendment, the Eighth Amendment, 42 U.S.C. § 1985, and New York common law) in order to construe Plaintiff's Amended Complaint liberally and to resolve all of the claims he appears to be asserting. *See McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) ("We liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest.").

subsequent four years.

4.     As of mid-2015, Plaintiff was living in Endicott, New York, with Crowley, their three children, three of Crowley's other children, a friend of Crowley, and the friend's three children.

5.     Plaintiff later testified that living with nine children was "kind of "hectic," "a little bit [c]razy," and "a little [s]tressful."

6.     Plaintiff, Crowley, and Crowley's friend all regularly used a car which was owned by Crowley's friend.

7.     One afternoon in June 2015, Plaintiff got into an argument with Crowley outside their home.

8.     Plaintiff had "had some beers" that day before his argument with Crowley.

9.     The argument arose because Plaintiff was frustrated that Crowley and her friend would frequently go out, leaving the household's nine children in Plaintiff's care.

10.    During the argument, Plaintiff broke Crowley's phone and slashed three of the tires of the household car to prevent Crowley from leaving him at home with the children.

11.    At the time of the argument, the children were playing nearby in the next-door neighbor's yard, and they were visible to Plaintiff as he slashed the tires of the car and argued with Crowley.

12.    Plaintiff was arrested as a result of the incident and pled guilty.

13.    Pursuant to this arrest and guilty plea, Plaintiff served about four months in the Broome County Jail.

14.    While Plaintiff was in jail, he heard from Child Protective Services caseworkers

who had visited him in jail, as well as from fellow inmates and news reports, that Crowley was dealing drugs and "hanging with sex offenders," that a meth lab and heroin needles had been found in his home, and that the home had been "taped off" due to a drug investigation.

15.     Crowley habitually neglected her children, left the house "a total wreck," left the children without supplies in the care of acquaintances, and ultimately abandoned the children entirely.

16.     Crowley's father eventually visited, located the children, and took them home with him to North Carolina.

17.     At some point after abandoning the children, Crowley was arrested for prostitution in Virginia.

18.     In October 2015, Plaintiff was extradited to Pennsylvania pursuant to an outstanding fugitive warrant for misdemeanor assault; he then served about one month of jail time in Pennsylvania.

19.     Plaintiff was released from jail in Pennsylvania on or around the first week of November 2015.

20.     Plaintiff was homeless for about one month thereafter, during which time the Broome County Department of Social Services ("DSS") briefly provided him with a hotel room.

21.     Plaintiff then obtained an apartment on John Street in Binghamton, where he lived for "at least six months" but "less than a year."

22.     On March 11, 2016, Crowley's father brought the children to Binghamton intending to return them to Plaintiff, but the Broome County Family Court ("Family Court") issued an order placing the children in the custody of the DSS.

23.     On March 11, 2016, the DSS took the children into its custody.

24.     Defendant Berkshire Farm Center and Services for Youth is a New York not-for-profit corporation which contracts with Broome County to provide foster care management services.

25.     Defendant Eaves is (and was at all times relevant to this case) a Family Specialist employed by Defendant Berkshire.

26.     On March 11, 2016, after the Family Court had issued its order and DSS had taken custody of the children, Defendant Berkshire was retained by DSS to provide foster care management services to Plaintiff's children who had been placed in DSS's custody.

27.     Defendant Eaves was assigned by Defendant Berkshire to assist DSS with identifying a suitable private foster home and transitioning the children into foster care.

28.     Defendant Eaves has remained involved with the children's case as the assigned Case Planner.

29.     Defendant Eaves does not have custody of the children (who remain in private foster homes to this day), but she supervises their visits with Plaintiff and Crowley, and she communicates with the parents to coordinate visitation and keep them apprised of the status of the family's case.

30.     A Family Assessment and Service Plan ("FASP") report is an internal document that is shared amongst the team of caseworkers assigned to a family–including DSS personnel and Defendant Berkshire's employees–to assist them with day-to-day case management.

31.     DSS personnel create an initial FASP after opening a new case.

32.     Thereafter, the FASP is maintained by the case planner assigned to a family to

track the status of the family's case and set goals for the future.

33.     A FASP includes a "Family Service Plan" section that documents the case planner's opinions regarding birth parents' preparedness to care for their children.

34.     The primary purpose of the "Family Service Plan" section is to provide guidance to the parents regarding what steps they may need to take to regain custody of their children.

35.     From time to time, copies of FASP reports are provided to the birth parents to inform them of the steps they may need to take to regain custody.

36.     The concerns and goals documented in the FASP reports are also discussed with birth parents at in-person meetings.

37.     The initial FASP for Plaintiff's children was created by DSS personnel on or about April 8, 2016.

38.     Defendant Eaves met with Plaintiff on May 4, 2016, for a Service Plan Review.

39.     On or about May 23, 2016, Defendant Eaves completed the "Family Service Plan" section of the FASP.

40.     The comments that Defendant Eaves entered into the FASP reflected her independent professional opinions regarding the problems facing Plaintiff's children and what could be done to resolve those problems, with the goal of ultimately removing the children from foster care and returning them to their birth parents' custody.

41.     Defendant Eaves formed her opinions based upon her interactions with Plaintiff and upon the background information provided to her by DSS.[3]

---

[3]     Plaintiff denies this asserted fact.  (Dkt. No. 54, Attach. 1, at 31, ¶ 41 [Pl.'s Rule 7.1 Resp.].)  However, the evidence he cites in support of his denial (i.e., Exhibit B) does not contradict the asserted fact.  This asserted fact is therefore deemed admitted.

42.     The Service Plan included a list of Defendant Eaves' concerns regarding both Plaintiff and Ms. Crowley.

43.     The Service Plan also contained a proposed set of goals for resolving each concern.

44.     Each concern was accompanied by goal-setting comments under the headings "Outcome (Definition of Achievement)" and "Family Activities."

45.     For Plaintiff, Defendant Eaves' comments and goals included the following:

> Comment: "Tim may have suspected mental health issues that interfere with his ability to parent effectively."
> Goals: "Tim will have a mental health evaluation and follow any and all recommendations"; "Tim will find a mental health provider, if needed."
>
> Comment: "Tim has a history of not being able to control his anger."
> Goals: "Tim will be able to control his emotions without becoming physical or threatening"; "Tim will enroll in, participate in and show benefit from an anger management class"; "Tim will not have any angry outbursts that scare or threaten others."
>
> Comment: "Tim lacks the ability to properly supervise and parent his children."
> Goals: "Tim will be able to parent and supervise his children as evidenced by improvement to his parenting skills and engagement during visits"; "Tim will enroll in, participate in, and show benefit from parenting classes"; "Tim will engage with all of his children for the entire visit."
>
> Comment: "Tim has a long history of criminal activity and has served jail time."
> Goals: "Tim [will] not have any police contact"; "Tim will refrain from illegal activities."
>
> Comment: "Tim has not shown stable housing."
> Goals: "Tim will show that he will be able to care for the children, meet their medical needs and ensure that the children will be safe."

46.     Defendant Eaves provided Plaintiff with a copy of the FASP.[4]

---

[4]     Plaintiff denies this asserted fact but has failed to either cite or provide any evidence in support of that denial. (Dkt. No. 54, Attach. 1, at 32, ¶ 46 [Pl.'s Rule 7.1 Resp.].)

47.     Defendant Eaves never provided the FASP to the Family Court and has no

knowledge of it ever being provided to the Family Court by anyone else.[5]

48.     In the instant action, the Berkshire Defendants served Plaintiff with discovery

demands requesting that he specifically identify which statements by Defendant Eaves he claims

are false.

49.     Following multiple court conferences, Plaintiff provided verified discovery

responses dated October 10, 2018, which identified the following statements that he claimed

were false: "Tim may have suspected mental health issues that interfere with his ability to parent

effectively," "Tim has a history of not being able to control his anger," "Tim lacks the ability to

properly supervise and parent his children," "Tim has a history of criminal activity," and "Tim

has not shown stable housing."

50.     Along with his October 10, 2018, discovery responses, Plaintiff produced 34

pages of documents marked with page numbers TS1 through TS34.  These documents include a

copy of the FASP, as well as other documents.  Defendant Eaves did not author or create any part

---

This fact is therefore deemed admitted.

[5]     Plaintiff denies this asserted fact, citing to his Exhibit I, noting that it is "[one]
page out of about 15 hundred pages attached."  (Dkt. No. 54, Attach. 1, at 32, ¶ 47 [Pl.'s Rule 7.1
Resp.].)  To the extent that Plaintiff appears to be attempting to rely on evidence that has not
been submitted to this Court, such reliance is improper and cannot create a genuine issue of
material fact.  Within the evidence that Plaintiff attached to his opposition memorandum of law,
the Court can find no evidence supporting Plaintiff's denial (i.e., showing either that Defendant
Eaves provided the FASP to the Family Court or that she had knowledge that it had been
provided to the Family Court by someone else).  Exhibit I in particular consists of a "Family
Services Progress Note" that was apparently submitted to the Family Court; but this Progress
Note does not indicate that it is a part of the FASP, nor does this Progress Note state or suggest
that Defendant Eaves or someone else provided the Family Court with the FASP (and in
particular the portion of the FASP containing the statements that Plaintiff alleges are false).  This
asserted fact is therefore deemed admitted.

of the non-FASP documents marked as TS9 through TS34.[6]

51. On August 2, 2017, the Family Court issued a Decision and Order relating to a neglect petition that the DSS had filed against Plaintiff and Justine Crowley.

52. The August 2, 2017, Family Court decision states that a neglect and abandonment hearing was held before the Family Court in June 2017.

53. Plaintiff testified at the June 2017 hearing.

54. According to the Family Court decision of August 2, 2017, Plaintiff testified that he and Crowley had "fought almost constantly" during their relationship.

55. In its decision of August 2, 2017, the Family Court held as follows: "[T]he evidence clearly established by a preponderance of evidence a pattern of domestic violence [by Plaintiff] to which the children were regularly exposed. Ar was harmed by having witnessed the violence between his parents. . . . [T]he acts of domestic violence committed by [Plaintiff] endangered the other children [as] well. . . . The record established a pattern of continuing violence [by Plaintiff] which placed the children in imminent danger of physical, mental or emotional impairment. . . . Accordingly, the Department has proven neglect by a preponderance

---

[6] Plaintiff denies this asserted fact, although it is unclear precisely which portion of the asserted fact he is denying and, in any event, he failed to cite evidence in support of that denial. (Dkt. No. 54, Attach. 1, at 32, ¶ 50 [Pl.'s Rule 7.1 Resp.].) Instead, he states that he was "[u]nable to mail this 1500 page document but I will provide it at March 7 hearing." (*Id.*) Regardless of the fact that it is not clear what 1,500 page document Plaintiff is referring to or how it is material to the asserted fact, there is no evidence that Plaintiff ever submitted any such document at any time after filing his opposition memorandum of law. (*See generally* Docket Sheet.) Because Plaintiff's denial is unsupported and ineffective, this asserted fact is deemed admitted.

of evidence."[7]

56.     The documents produced by Plaintiff in response to the Berkshire Defendants'
Interrogatories include a New York Office of Children and Family Services administrative order
addressing Plaintiff's challenge to two reports of child maltreatment that had been entered in the
New York State Central Register of Child Abuse and Maltreatment.

57.     The administrative order upheld the reports in deference to the Family Court's
decision of August 2, 2017.

58.     The Family Court held a hearing on May 17, 2018, pursuant to a request for
custody filed by Plaintiff.

59.     After considering Plaintiff's testimony at the hearing of May 17, 2018, the Family
Court refused to return the children to Plaintiff's custody, holding that he had "no insight" and
"what appears to be" a "persecution complex" that rendered him unable to "effectively care for
the children."

60.     Plaintiff was deposed on February 12, 2018, in connection with a claim he filed
against New York State and Broome County.

61.     Plaintiff was deposed on November 20, 2018, in connection with this case.

62.     During his depositions, when questioned regarding his criminal history, Plaintiff

---

[7]     Plaintiff denies this asserted fact, acknowledging that the Family Court said the
quoted statement, but that evidence establishes that the Family Court's findings were wrong.
(Dkt. No. 54, Attach. 1, at 32, ¶ 55 [Pl.'s Rule 7.1 Resp.].)  However, because the asserted fact
relates solely to what the Family Court found and stated in its decision, Plaintiff's
acknowledgment that the Family Court did indeed find as much is essentially an admission of the
asserted fact.  In other words, Plaintiff is improperly denying what he perceives to be an
implication of the asserted fact, not the asserted fact itself.  This fact is therefore deemed
admitted.

testified that could not "remember everything" but that he had pled guilty to "a misdemeanor here and there" and had been arrested "a few times."

63.     Plaintiff pled guilty to a robbery charge at age 17 after trying to rob a grocery store with a plastic gun, and was on probation for five years.

64.     Plaintiff also served some jail time for "little misdemeanor stuff" "when [he] was young."

65.     Plaintiff served a prison sentence from 2002 to 2004 after pleading guilty to a charge of criminal contempt.

66.     Plaintiff's contempt conviction resulted from his admittedly "numerous" violations of a restraining order obtained by a former girlfriend with whom he had been arguing "all the time" over custody and visitation of some of Plaintiff's other children.

67.     During his prison sentence, Plaintiff was moved from a minimum-security prison to a medium-security prison, then to a "maxi-max" security prison, and then to two maximum security prisons.

68.     Plaintiff testified that he was transferred from a minimum-security prison to a medium-security prison after getting attacked by another inmate over a gambling debt, and that he was sent to higher-security prisons after getting a "ticket" when his ex-girlfriend told the authorities that he had sent her a threatening letter.

69.     After his release from prison in 2004, Plaintiff faced criminal charges "off and on" and was in jail "quite a few times."

70.     Plaintiff testified that, while he was living in Pennsylvania around 2007, he "won" a fistfight with someone who owed him money, resulting in the assault warrant that later led to

his 2015 extradition to Pennsylvania.

71.     Around 2007 or 2008, Plaintiff was arrested following another altercation, in which he had been "arguing with someone and . . . broke their phone."

72.     While under arrest for that altercation, Plaintiff was picked out from a lineup and charged with four counts of armed robbery.

73.     After this charge, Plaintiff was jailed for almost a year on Rikers Island.

74.     Plaintiff testified that he was acquitted of the robbery charges.

75.     In 2010, while intoxicated after "drinking a lot" at a party, Plaintiff got into an altercation with several other people which, according to his testimony, did not escalate into a direct physical fight, but during which he "kicked their car" and threw a knife into the street while announcing that he "[didn't] even need this knife" because he "could fight without a knife."

76.     As a result of this incident, Plaintiff was charged with possession of a knife and held in Broome County Jail for thirteen months.

77.     Around 2011 or 2012, Plaintiff had a fistfight with Crowley's ex-husband, which apparently resulted in no criminal charges.

78.     In the summer of 2017, Plaintiff pled guilty to trespassing after kicking in an apartment door during an argument with another resident of his building, and he served a brief jail sentence.

79.     Plaintiff had been drinking before the trespassing incident in the summer of 2017.

80.     Plaintiff was jailed briefly in May 2018 on a charge of welfare fraud, which was ultimately resolved via a conditional release agreement.

81.     While Plaintiff was residing at his John Street apartment, he also frequently stayed

with his new fiancée at her apartment on Grant Street in Johnson City.

82.     Plaintiff eventually moved out of his John Street apartment and into his fiancée's Grant Street apartment.

83.     While living on Grant Street, Plaintiff also resided part-time in the nearby apartment of his fiancée's sister to help take care of the apartment while his fiancée's sister served a prison sentence for drug dealing.

84.     Plaintiff and his fiancée then moved to a larger apartment on Balcom Avenue in Binghamton for "a year or less," apparently also during 2016.

85.     Plaintiff's Balcom Avenue landlord brought an eviction action against him when he fell behind on rent.

86.     Plaintiff and his fiancée then moved to an apartment in Johnson City, New York.

87.     Plaintiff was still residing in the Johnson City apartment as of his deposition in November of 2018.

88.     At some point, Plaintiff falsely told DSS that he was merely "couch surfing" in order to avoid jeopardizing his fiancée's welfare benefits.

89.     Plaintiff received medical treatment at various times for "mental conditions," which included "severe depression," as well as sleeping problems for which he was prescribed anti-psychotics.

90.     Plaintiff visited a therapist who "agreed with [Defendant Eaves]" that Plaintiff "[did not] have good parenting skills."

**C.** **Undisputed Material Facts on the DSS Defendants' Motion for Summary Judgment**

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by the DSS Defendants in their Statement of Material Facts and expressly admitted by Plaintiff in his response thereto or denied without appropriate record citations supporting his denial. (*Compare* Dkt. No. 51, Attach. 5 [DSS Defs.' Rule 7.1 Statement] *with* Dkt. No. 54, Attach. 1 [Pl.'s Rule 7.1 Resp.].)

1. The Plaintiff commenced this action by filing a Summons and Complaint on March 13, 2017; he later filed an Amended Complaint on May 26, 2017.

2. The Summons and Complaint was served upon Defendants Ziegenhagen, Tokos, Hepworth, Laymon, Patterson, Carter, Santoni, Tkach, Choynowski and Peterson on September 26, 27 and 28, 2017.

3. An Answer to the Summons and Complaint was submitted on November 29, 2017.

4. On March 11, 2016, an Order of the Broome County Family Court ("Family Court") was entered directing the removal of the three minor children of Plaintiff and Justine Crowley by the Broome County Department of Social Services ("DSS") and directing that a Family Court Act Section 1034 investigation be conducted as to any maltreatment of the children.

5. Plaintiff and Crowley were residents of Broome County at the time that the report was made; as a result, the matter was investigated by the DSS Child Protective Services Unit.

6. Such investigation determined that there was credible evidence to find that the

subject children had been maltreated in that Plaintiff had a history of instability and was unable to adequately provide care for the children.

7.      Thereafter, on April 7, 2016, the initial report of maltreatment was found to be "indicated" under Section 412(7) of New York Social Services Law, and this finding was entered into the Central Register.

8.      On April 20, 2016, an additional report was made alleging that Plaintiff had caused the children to witness acts of violence in the home against their mother.

9.      On May 5, 2016, this report was also found by DSS to be "indicated."

10.     Plaintiff requested an administrative hearing to amend the indicated reports to remove him as a named party by DSS.

11.     By an Order of May 4, 2018, Plaintiff's request was denied and the findings of the indicated reports were upheld.

12.     Subsequently, on March 17, 2016, a neglect petition was filed in Family Court naming Plaintiff as a Respondent.

13.     An Order of the Family Court was entered on August 2, 2017, after trial, finding that the three named children who had been removed on March 11, 2016, and placed in the temporary custody of DSS had been neglected and that Plaintiff was the person responsible for this neglect.

**D.      Parties' Briefing on Defendants' Motions for Summary Judgment**

**1.      The Birkshire Defendants' Memorandum of Law-In-Chief**

Generally, in their motion for summary judgment, the Birkshire Defendants make six arguments.  (Dkt. No. 50, Attach. 1, at 15-29 [Birkshire Defs.' Mem. of Law].)  First, as a

general matter, the Birkshire Defendants argue that, because they did not become involved in the underlying events until after Plaintiff's children were taken into custody by DSS, they cannot be subject to any claims based on the actual removal of the children. (*Id.* at 15-16.) The Birkshire Defendants also argue that Plaintiff is barred by the *Rooker-Feldman* doctrine from asserting any claims that challenge the validity of the Family Court's removal order or other custody decisions. (*Id.*)

Second, the Birkshire Defendants argue that Plaintiff has failed to state a claim under the Fourth Amendment because, to the extent that he asserts a claim of wrongful seizure of his children and malicious prosecution, (a) parents lack standing to bring a wrongful seizure claim because the deprivation of rights in such a case belongs to the child rather than the parent (and Plaintiff has not brought any claims on behalf of his children), (b) any claim of wrongful seizure of his children nonetheless cannot succeed because the Birkshire Defendants did not seize his children, and (c) as to a claim of malicious prosecution, there has been no criminal proceeding here, much less one that terminated in Plaintiff's favor. (*Id.* at 16-18.)

Third, the Birkshire Defendants argue that Plaintiff cannot maintain a claim for conspiracy under 42 U.S.C. § 1985 because he has not alleged or established a conspiracy to infringe his rights that was motivated by discriminatory animus. (*Id.* at 18.)

Fourth, the Birkshire Defendants argue that Plaintiff has failed to state a valid claim under 42 U.S.C. § 1983 for the following reasons: (1) the Birkshire Defendants are not state actors because Defendant Birkshire is a private entity; (2) Defendant Birkshire is not a "private child-caring institution" that would be classified as a state actor under Second Circuit precedent because Plaintiff does not argue that the custodial care of his children caused the injury, but

rather that Defendant Eaves' comments influenced the Family Court's decisions; and (3) Defendant Eaves' statements were not made under the color of law because they were her own opinions. (*Id.* at 19-21.)

Fifth, the Birkshire Defendants argue that Plaintiff's claim under the Fourteenth Amendment is (a) barred by collateral estoppel and (b) not supported by the evidence. (*Id.* at 22-28.) As to collateral estoppel, the Birkshire Defendants argue that Plaintiff is estopped from challenging the truth of some of the statements made by Defendant Eaves because the Family Court has already made rulings on issues related to those statements (i.e., Plaintiff's fitness as a parent). (*Id.* at 25-26.) As to whether his claim is supported, the Birkshire Defendants argue that, even if Plaintiff has asserted a valid liberty interest in the deprivation of his children, he has failed to establish a causal nexus between Defendant Eaves' statements and his inability to regain custody because there is no evidence to show that her statements were disclosed to the Family Court. (*Id.* at 22-23.) Additionally, the Birkshire Defendants argue that (a) Defendant Eaves' statements are non-actionable expressions of opinion under New York defamation law, (b) the evidence establishes that those statements were nonetheless true, (c) there is no indication that Defendant Eaves acted negligently in making any false statements, and (d) to the extent Plaintiff intends to rely on any statements made as part of Defendant Eaves' testimony in the Family Court proceedings, she is entitled to absolute immunity for that testimony. (*Id.* at 23-28.)

Sixth, and last, the Birkshire Defendants argue that, even if they are found to be state actors, Defendant Eaves would be protected by the doctrine of qualified immunity and Defendant Birkshire would not be responsible for her conduct because (a) Plaintiff cannot show that Defendant Eaves lacked an objectively reasonable basis for her statements, and (b) there is no

evidence that Defendant Eaves was acting pursuant to an established policy of Defendant Birkshire when making the allegedly defamatory statements. (*Id.* at 28-29.)

### 2. The DSS Defendants' Memorandum of Law-In-Chief

Generally, in their motion for summary judgment, the DSS Defendants make eight arguments. (Dkt. No. 51, Attach. 4, at 3-16 [DSS Defs.' Mem. of Law].) First, the DSS Defendants argue that any pendant state law causes of action asserted in the Amended Complaint must be dismissed due to Plaintiff's failure to comply with N.Y. County Law § 52 (which incorporates the notice-of-claim requirements of N.Y. Gen. Mun. L. §§ 50-e and 50-i to suits against Broome County) because he has failed to serve a notice of claim. (*Id.* at 3-4.)

Second, the DSS Defendants argue that Plaintiff's claims against them in their official capacity must be dismissed because such claims essentially amount to suing the county itself. (*Id.* at 5.)

Third, the DSS Defendants argue that liability cannot be imposed on them on the basis of respondeat superior because Plaintiff has not shown that they personally participated in the investigation or maltreatment reports that resulted in the removal of Plaintiff's children from his custody, and he has not shown that they acted pursuant to a municipal policy or custom. (*Id.* at 6-7.)

Fourth, the DSS Defendants argue that Plaintiff has failed to state a cause of action against them because they had a reasonable basis for their investigations and reports. (*Id.* at 8-9.)

Fifth, the DSS Defendants argue that Plaintiff's claim for infliction of emotional distress must be dismissed because (a) such claims cannot be made against a governmental entity, and (b) he has not shown that the conduct alleged was extreme or outrageous or that it endangered his

physical safety or caused him to fear for his physical safety.  (*Id.* at 10-11.)

Sixth, the DSS Defendants argue that Plaintiff's claims against Broome County as to the actions of DSS must be dismissed because there is no basis for imposing municipal liability.  (*Id.* at 12.)

Seventh, the DSS Defendants argue that Plaintiff's claims against them in their individual capacities must be dismissed because they are entitled to qualified immunity under the good-faith exception in N.Y. Soc. Servs. L. § 419, arguing also that Plaintiff has not alleged or established that they acted outside the scope of their employment or beyond the discharge of their duties. (*Id.* at 13-14.)  The DSS Defendants also argue that qualified immunity is warranted because the Family Court deemed their reports to be truthful.  (*Id.*)

Eighth, and last, the DSS Defendants argue that Plaintiff's claims under the Fourteenth Amendment must be dismissed because he has not established a causal nexus between their actions and the removal/continued placement in foster care of his children by DSS.  (*Id.* at 15-16.)  The DSS Defendants also argue that Plaintiff has not shown that any of the allegations they made were false.  (*Id.*)

### 3.    Plaintiff's Opposition Papers

In response to Defendants' motions, Plaintiff submitted a document discussing his past experience in caring for children, arguing that Defendants' various statements that he was a "drug addict," a "child and woman abuser," and "in general a bad guy" are all false, and asserting that his children are being abused in foster care.  (Dkt. No. 54, at 1-3 [Pl.'s Opp'n Papers].)  The Court notes that, before filing his opposition papers, Plaintiff had to be adequately advised of the potential consequences of failing to file a proper opposition memorandum of law.  (*See, e.g.*,

Dkt. No. 50, Attach. 10; Dkt. No. 3, at 2.)  *See also* N.D.N.Y. Pro Se Handbook, at 40; N.D.N.Y. L.R. 7.1(b)(3).

### 4. The Birkshire Defendants' Reply Memorandum of Law

In reply to Plaintiff's response, the Birkshire Defendants make three arguments.  (Dkt. No. 55, at 4-9 [Birkshire Defs.' Reply Mem. of Law.].)  First, the Birkshire Defendants argue that Plaintiff has essentially admitted the arguments made by the Birkshire Defendants by failing to oppose them in his opposition papers.  (*Id.* at 4-5.)

Second, the Birkshire Defendants argue that Plaintiff's arguments in opposition are not relevant to this case because (a) the Court cannot rule on the validity of the Family Court's findings (including his fitness as a parent), and (b) his assertion that his children are being abused in foster care are both untrue and irrelevant to his claims.  (*Id.* at 5-6.)

Third, and last, the Birkshire Defendants argue that Plaintiff has failed to create any genuine dispute of material fact as required on a motion for summary judgment.  (*Id.* at 6-9.)

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[8]  As for the materiality requirement, a dispute of fact is

---

[8]  As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).[9]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[10] (This is because the Court extends special solicitude to the *pro se* litigant by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[11] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigant must obey a district court's procedural

---

[9] Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[10] *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[11] *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

rules.[12]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[13]–even where the non-movant was proceeding *pro se*.[14]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local

---

[12]      *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

[13]      Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[14]      *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

Rule 7.1(b)(3).[15]  Stated another way, when a non-movant fails to oppose a legal argument

asserted by a movant, the movant may succeed on the argument by showing that the argument

possess facial merit, which has appropriately been characterized as a "modest" burden.  *See*

N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined

that the moving party has met its burden to demonstrate entitlement to the relief requested therein

. . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30,

2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at

*2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.  ANALYSIS

### A.  Whether Plaintiff's Fourth Amendment Claims Must Be Dismissed

After careful consideration, the Court answers this question in the affirmative for the

reasons stated in the Birkshire Defendants' memoranda of law.  *See, supra*, Part I.D.1, 4. of this

Decision and Order.  To those reasons, the Courts adds the following analysis.

As a general matter that applies to both the Birkshire Defendants and the DSS

Defendants, the Court finds that Plaintiff is not entitled to claim any personal Fourth Amendment

right as a parent related to the seizure of his children.  "Fourth Amendment rights are personal

rights" that "may not be vicariously asserted," such that only the allegedly seized children–not

---

[15]       *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31
(N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to
oppose several arguments by defendants in their motion for summary judgment as consent by
plaintiff to the granting of summary judgment for defendants with regard to the claims that the
arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-
0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's
failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession
by plaintiff that the court should exclude [the expert's] testimony" on that ground).

their parents–may assert a violation of the Fourth Amendment related to seizure of a child by a governmental entity. *Uwadiegwu v. Dept of Soc. Servs. of the Cnty of Suffolk*, 91 F. Supp. 3d 391, 395 (E.D.N.Y. 2015) (citing *Southerland v. City of New York*, 667 F.3d 87, 103 [2d Cir. 2012]) (other citations omitted). Plaintiff has not asserted any claims on behalf of his children in this case, but instead seeks to vindicate only his personal Fourth Amendment rights. Therefore, to the extent that the basis for Plaintiff's Fourth Amendment claim is the seizure of his children, such claim must fail.

Additionally, the initial seizure of the children was effected on an order of the Family Court. "In the context of a seizure of a child by the State during an abuse investigation . . . a court order is the equivalent of a warrant." *Tenenbaum v. Williams*, 193 F.3d 581, 602 (2d Cir. 1999). It is undisputed that, on March 11, 2016 (the day that DSS took Plaintiff's children into custody) the Family Court had issued an order placing those children into DSS's custody. *See, supra*, Part I.B. of this Decision and Order. The children were therefore seized under the functional equivalent of a warrant and, because Plaintiff has not offered any factual allegations plausibly suggesting (or evidence supporting) that the presumption of reasonableness applicable to that seizure as a result of the Order should not apply, Plaintiff has not stated a claim under the Fourth Amendment in this respect either.

## 1.    The Birkshire Defendants[16]

Plaintiff's allegations against the Birkshire Defendants consist of his assertions that (a) his children are being abused in their foster care placements, which abuse Defendant Birkshire Farms has failed to remedy, and (b) Defendant Eaves made false statements about factors indicative of Plaintiff's fitness as a parent.  (Dkt. No. 5, at 10-12 [Pl.'s Am. Compl.].)

As discussed above, Plaintiff possess no personal Fourth Amendment right that has been implicated in the seizure of his children; he similarly does not possess a personal Fourth Amendment right in the treatment of his children while in foster care.  Plaintiff therefore cannot assert a valid Fourth Amendment claim based on his allegations that his children are being abused in foster care and that Defendant Birkshire has ignored that abuse.

Nor do Defendant Eaves' allegedly false statements appear to implicate any Fourth Amendment right.  Plaintiff does not allege any seizure of his person as a result of these statements, only the continued holding of his children in foster care.

Lastly, as the Birkshire Defendants argue, to the extent that Plaintiff is intending to assert a malicious prosecution claim, such a claim can be brought only in relation to criminal

---

[16]    The Court finds that, regardless of the cogency of the Birkshire Defendants' arguments that they do not constitute state actors, the Court must nonetheless conclude that they are state actors based on current Second Circuit precedent.  *Perez v. Sugarman*, 499 F.2d 761, 765 (2d Cir. 1974); *see also Duchesne v. Sugarman*, 566 F.2d 817, 822 (2d Cir. 1977).  Although the continuing legal validity of such precedent has been criticized by other courts in this Circuit, this Court finds, as have others, that it is constrained to apply that precedent until the Second Circuit overrules it.  *See Mortimer v. City of New York*, 15-CV-7186, 2018 WL 1605982, at *13 (S.D.N.Y. Mar. 29, 2018) (collecting cases); *S.W. ex rel. Marquis-Abrams v. City of New York*, 46 F. Supp. 3d 176, 195 (E.D.N.Y. 2014) (collecting cases); *Phelan ex rel. Phelan v. Torres*, 843 F. Supp. 2d 259, 268-74 (E.D.N.Y. 2011) (discussing in great detail why the Court believed that this principle was no longer good law, but ultimately applying it because the Second Circuit had never overruled it).

proceedings that terminated in the plaintiff's favor. *See Phillips v. DeAngelis*, 571 F. Supp. 2d 347, 353 (N.D.N.Y. 2008) (Hurd, J.) (noting that a claim for malicious prosecution under the Fourth Amendment requires a showing of "an initiation or continuation of criminal proceedings by the defendant"). However, Plaintiff was not subjected to any criminal proceedings as a result of the circumstances underlying his claims; rather, he was subjected to neglect proceedings in Family Court, which is a civil court. Additionally, regardless of the type of proceedings, it is undisputed that they did not resolve in Plaintiff's favor, given that he was found to have committed neglect of his children and denied reinstatement of custody by the Family Court. Consequently, to the extent Plaintiff intended to assert a malicious prosecution claim, such claim must fail.

Based on the above, the Court finds that Plaintiff has failed to state and/or establish a claim under the Fourth Amendment against the Birkshire Defendants.

### 2. The DSS Defendants

Plaintiff's allegations against the DSS Defendants consist of his assertions that (a) on March 17, 2016, Defendant Julia Hepworth signed and sent to Plaintiff a ten-page letter of "false allegations" and a summons to appear in court on March 18, 2016, (b) on April 8, 2016, Defendant Traci Ziegenhagen sent him an "indicated" report (i.e., a finding that maltreatment has been "indicated" as reported) based on false allegations of maltreatment and abuse of his children and placed him on the state registry, (c) on April 8, 2016, Defendant Katrina Tokos approved Defendant Ziegenhagen's "indicated" report, (d) on May 5, 2016, Defendant Marissa Carter sent him an "indicated" report based on false allegations of maltreatment or abuse of his children and placed him on the state registry, (e) on May 5, 2016, Defendant Kathleen Santoni approved

Defendant Carter's "indicated" report, (f) on June 15, 2016, Defendant Jessica Layman sent him an "indicated" report based on false allegations of maltreatment or abuse of his children and placed him on the state registry, (g) on June 15, 2016, Susan Patterson approved Defendant Layman's "indicated" report, (h) on September 27, 2016, Defendant John Tkach signed a permanency hearing report containing false allegations against him, (i) on September 27, 2016, Defendant John Choynowski approved Defendant Tkach's report, and (j) on May 9, 2017, Defendant Jon Peterson and Defendants Choynowski and Tkach signed a "termination of my parental rights summons" containing false allegations. (Dkt. No. 5, at 3-9 [Pl.'s Am. Compl.].)

The Court notes as an initial matter that all of the actions of these Defendants occurred after Plaintiff's children were initially seized pursuant to the Family Court's order on March 11, 2016. Additionally, as with his allegations against the Birkshire Defendants, Plaintiff has failed to allege any action of any of the DSS Defendants that resulted in a seizure of his person as opposed to the continued seizure of his children, given that all of the allegations that the DSS Defendants made false statements against him primarily serve to support his assertion that the seizure of his children was wrongful. None of these allegations support a Fourth Amendment claim for the same reasons as discussed above.

The only allegations that would potentially suggest a seizure of Plaintiff in particular are his allegations that certain Defendants' "indicated" reports resulted him in being placed on a state child abuse registry. However, the Court is not convinced that such allegations plausibly suggest an unreasonable seizure in the meaning of the Fourth Amendment. *Cf Doe v. Cuomo*, 755 F.3d 105, 115 (2d Cir. 2014) (finding that, even if the requirement to register as a sex offender under the federal statute constituted a search or seizure [which the court did not decide], any such

search or seizure was reasonable based on the fact that it served the special need of protecting potential future victims and that the degree of intrusion was reasonable in relation to the interests advanced by the statute). Black's Law Dictionary defines a "seizure" as "[t]he act or an instance of taking possession of a person or property by legal right or process; esp., in constitutional law, a confiscation or arrest that may interfere with a person's reasonable expectation of privacy." Black's Law Dictionary (11th ed. 2019). Plaintiff has not alleged any way in which his inclusion on such a registry violates his reasonable expectation of privacy; he has not alleged or offered any evidence to establish that the registry is available to the public or even what information it contains. The Court therefore finds that Plaintiff has not plausibly alleged that being placed on the New York child abuse registry constituted a seizure.

For all of the above reasons, the Court finds that Plaintiff has failed to state and/or establish a claim under the Fourth Amendment against the DSS Defendants.

**B.      Whether Plaintiff's Fourteenth Amendment Claims Must Be Dismissed**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 50, Attach. 1, at 22-28 [Birkshire Defs.' Mem. of Law]; Dkt. No. 51, Attach. 4, at 13-16 [DSS Defs.' Mem. of Law]; Dkt. No. 55, at 4-9 [Birkshire Defs.' Reply Mem. of Law].) To those reasons, the Courts adds the following analysis.

As an initial matter, the Court construes Plaintiff's allegations as to his Fourteenth Amendment claim as asserting a violation of his due process rights, and will therefore assess Plaintiff's claims in that respect.

### 1.      The Birkshire Defendants

As to a claim of procedural due process, Plaintiff appears to allege that his liberty interest in having custody of his children was violated by the Birkshire Defendants' actions, and that his reputation was damaged by Defendants' statements.  The Supreme Court has held that parents have a "fundamental liberty interest . . . in the care, custody, and management of their child." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982).  "As a general rule . . . before parents may be deprived of the care, custody, or management of their children without their consent, due process–ordinarily a court proceeding, resulting in an order permitting removal–must be accorded to them." *Nicholson v. Scoppetta*, 344 F.3rd 154, 171 (2d Cir. 2003).  Here, it is undisputed that Plaintiff's children were initially removed from his custody pursuant to an order of the Family Court, and that subsequent findings of neglect and denials of reinstatement of custody have all been made by the Family Court after hearings.  Plaintiff has therefore not established a clear deficiency in the procedures afforded to him.  Additionally, even if Plaintiff has established a prima facie stigma-plus claim based on the damage to his reputation and his liberty interest in caring for his children, due process requires only that "he be given a post-deprivation opportunity to clear his name." *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004).  Plaintiff was afforded such an opportunity in the form of the custody–and neglect–proceedings already discussed.   Consequently, Plaintiff has not shown that he was denied procedural due process.

To the extent that Plaintiff alleges that the proceedings were somehow deficient because the Family Court based its decision on false statements or testimony by Defendant Eaves in particular, Plaintiff has not provided any evidence to establish that the Family Court even had

access to Defendant Eaves' statements in the relevant FASP, much less that there existed a causal nexus between those statements and the Family Court's ultimate decision. Even if there was a causal nexus, Plaintiff has also failed to show that these statements are demonstrably false statements of fact. Rather, many of these statements (i.e., that Plaintiff has suspected mental health issues and lacks the ability to properly supervise and parent the children) constitute Defendant Eaves' opinions based on her interactions with Plaintiff and review of other DSS documents about him. Additionally, as the Birkshire Defendants have laid out at length, the evidence available supports the accuracy of many of these statements, particularly pertaining to his history of criminal activity, his lack of effective anger management, and his unstable housing history. Plaintiff therefore has not sufficiently shown that, even if the Family Court had access to the FASP, those statements somehow tainted his ability to receive fair process.

Additionally, to state a claim for a violation of substantive due process, a plaintiff must demonstrate that the state action was "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011); *see Trombley v. O'Neill*, 929 F. Supp. 2d 81, 106 (N.D.N.Y. 2013) (Suddaby, J.) ("[A] parent's substantive due process claim can only be sustained if the removal of the child would have been prohibited by the Constitution even had the parent been given all the procedural protections to which he was entitled."). However, state action that is merely "incorrect or ill-advised" is insufficient to satisfy this standard; "[o]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Cox*, 654 F.3d at 275. The Family Court relied on the evidence before it when determining that Plaintiff should be denied custody, and it is not the function of this Court

to assess whether that finding was right or wrong, but merely whether, under the totality of the circumstances, it was so arbitrary as to constitute a constitutional violation. The Court cannot say that the Birkshire Defendants' actions, to the extent they may have contributed to the continuing denial of custody, were so arbitrary or egregious. *See Trombley*, 929 F. Supp. 2d at 106 (finding that the plaintiff failed to allege facts plausibly stating a claim for a violation of substantive due process rights where the removal of the children was pursuant to a Family Court order based on evidence that the children had witnessed a domestic violence incident while the plaintiff was also abusing alcohol in their presence). Plaintiff has therefore failed to establish a claim under the theory of substantive due process.

### 2. The DSS Defendants

The Court finds that Plaintiff's claims under the Fourteenth Amendment against the DSS Defendants fail for many of the same reasons as discussed above related to his claims against the Birkshire Defendants. As discussed above in relation to Plaintiff's claims under the Fourth Amendment, Plaintiff's claims are based on his allegation that all of the DSS Defendants either made or approved statements that Plaintiff alleges were false and that led to the Family Court both pursuing neglect proceedings against him and denying him custody of his children. However, Plaintiff has neither shown that he was denied any procedures to which he was entitled nor provided evidence to establish that the allegations made by the various DSS Defendants were false. Rather, it is undisputed that Plaintiff was involved in an altercation with the children's mother in which he broke her cell phone and slashed three of her tires while the children were in the next yard, which Plaintiff admitted occurred in an area that was visible from that next yard where the children were playing. This altercation was the subject of at least one of the indicated

32

reports.  Plaintiff has not otherwise specified what statements in the various reports he is asserting are false.

Additionally, there is no evidence to establish that, even if some of the statements in the reports were false or mistaken (a proposition that Plaintiff has not supported with evidence),[17] the alleged actions of the DSS Defendants were so arbitrary or egregious as to constitute a violation of Plaintiff's substantive due process rights.  In particular, Plaintiff has not presented any evidence that would suggest or establish that the DSS Defendants made or approved of the relevant statements in the report with an intent to injure him in an unjustifiable way.  *See Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018) (noting that the Supreme Court has cautioned that, in regard to executive [rather than legislative] conduct, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense," usually when the conduct is "intended to injure in some way unjustifiable by any government interest").  Plaintiff therefore has failed to establish a claim pursuant to the Fourteenth Amendment against the DSS Defendants.

### C.    Whether, in the Alternative, Defendants Are Protected by the Doctrine of Qualified Immunity as a Matter of Law

After careful consideration, the Court answers this question in the affirmative for the reasons stated in the Defendants' memoranda of law.  *See, supra*, Part I.1, 2 of this Decision and Order.  To those reasons, the Court adds the following analysis.

---

[17]    The Court notes in particular that, although Plaintiff disputes some of the facts alleged about the incident of domestic violence relied on in one of the relevant indicated reports (such as that he poured beer or gasoline on the children's mother), the Family Court's decision notes that one of the children who alleged witnessing the event reported that Plaintiff poured a liquid on Crowley during the incident.  (Dkt. No. 50, Attach. 7, at 3 [Family Court Decision and Order, Aug. 2, 2017].)  To the extent that the DSS Defendants relied on information from other sources (particularly the children involved) that was not obviously false, the Court cannot say that any such reliance was conduct that can be called egregious or conscience-shocking.

The doctrine of qualified immunity protects state actors "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Fabrikant v. French*, 691 F.3d 193, 212 (2d Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 [2009]). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he was doing violates that right," and "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law or fact." *Fabrikant*, 691 F.3d at 231. "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Id.* at 214.

Given that Plaintiff has failed to provide any evidence that the allegedly false statements were, in fact, false, or that Defendants knew their statements were false at the time they made them, there is no evidence to establish that the Birkshire Defendants or the DSS Defendants were unreasonable in believing that their making statements related to Plaintiff's actions and fitness as a parent complied with the law. *See Treistman v. Greene*, 12-CV-1897, 2017 WL 5201555, at *5 (N.D.N.Y. Nov. 9, 2017) (applying the doctrine of qualified immunity to child care workers); *Trombley*, 929 F. Supp. 2d at 106 (finding that DDS employees were entitled to qualified immunity because officials of reasonable competence could disagree as to whether their actions were unlawful given the evidence of neglect); *McCluskey v. Comm'r of Nassau Cnty Dept. of Soc. Servs.*, 12-CV-3852, 2013 WL 4780954, at *3 (E.D.N.Y. Sept. 5, 2013) (adopting the magistrate judge's recommendation that claims against a DSS employee in her official capacity are shielded by qualified immunity).

For all the above reasons, the Court finds that, to the extent Defendants are sued in their official capacities, Plaintiff's claims must be, and are, alternatively dismissed on the basis of the doctrine of qualified immunity.

**D.      Whether Plaintiff's Other Federal Claims Must Be Dismissed**

After careful consideration, the Court answers this question in the affirmative for the following reasons.

**1.      Claim Under the First Amendment**

Despite asserting a claim under the First Amendment, Plaintiff has not offered any factual allegations plausibly suggesting any such violation.  In particular, despite citing the fact that he is Muslim, he does not allege facts plausibly suggesting that Defendants' actions in any way prohibited him from free exercise of his religion.  Although parents have a First Amendment right to raise and educate their children according to their religious beliefs, when determining whether such right has been violated, the Court must look at the government's interest in the activity allegedly causing the violation.  *See Wisconson v. Yoder*, 406 U.S. 205, 213-14 (1972). The protection of children and their removal from harmful situations is "a state interest of sufficient magnitude" to warrant the parent's decreased ability to have control over the child's religious education to the extent that the parent no longer has custody over the child.  However, Plaintiff does not allege that Defendants in any way prevented him from encouraging the Islamic faith or from engaging in Islamic practices with his children during his permitted visitation time. Rather, the only way in which Plaintiff alleges Defendants interfered with his right to raise his children in his religious beliefs is his allegation that they cut his children's hair despite his request that they not cut it for religious reasons.  The Court cannot say that Defendants' actions

in cutting Plaintiff's children's hair alone plausibly alleges a violation of his First Amendment

right to raise his children according to his religious beliefs, and particularly not when that action

is balanced against the state's interest in protecting the health and safety of children in its care.

Plaintiff also has not alleged facts plausibly suggesting that his speech was suppressed or

that Defendants' actions were in retaliation for his exercise of his First Amendment rights.

Additionally, to the extent Plaintiff might perhaps be attempting to assert claim based on a

violation of his right of intimate association with his children, this claim must fail because the

Second Circuit and courts within this Circuit analyze such claims by applying the principles of

substantive due process (rather than the First Amendment) unless First Amendment interests are

specifically implicated, which, as already discussed, is not the case here. *See Uwadiegwu v. Dept*

*of Soc. Servs. of the Cnty of Suffolk*, 91 F. Supp. 3d 391, 397-98 (E.D.N.Y. 2015) (collecting

cases); *Garten v. Hochman*, 08-CV-9425, 2009 WL 302267, at *6-7 (S.D.N.Y. Jan. 28, 2009)

(collecting cases). Therefore, even construing the Complaint liberally, the Court cannot say that

Plaintiff has alleged facts plausibly suggesting a claim pursuant to the First Amendment.

### 2. Claim Under the Eighth Amendment

Similarly, despite nominally asserting a claim under the Eighth Amendment, Plaintiff has

not alleged any facts that plausibly suggest any violation of that amendment. In particular, the

Eighth Amendment's prohibition of cruel and unusual punishments applies only to persons

convicted in criminal proceedings. *See City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S.

239, 244 (1983) ("Eighth Amendment scrutiny is appropriate only after the State has complied

with constitutional guarantees traditionally associated with criminal prosecutions . . . [T]he State

does not acquire the power to punish with which the Eighth Amendment is concerned until after

it has secured a formal adjudication of guilt in accordance with due process of law."); *see also Whitely v. Albers*, 475 U.S. 312, 318 (1986) ("The Cruel and Unusual Punishments Clause 'was designed to protect those convicted of crimes,' . . . and consequently the Clause applies 'only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.'"); *Martinez v. Diamond*, 15-CV-0246, 2017 WL 4350573, at *2 (S.D.N.Y. July 11, 2017) (finding that the Eighth Amendment did not apply where the plaintiff was not in custody). Plaintiff has not alleged that he was subjected to any criminal proceedings, much less convicted and imprisoned on criminal charges, related to the loss of custody of his children. All of the legal proceedings discussed in the Amended Complaint, including the neglect proceedings, were civil proceedings in the Family Court. Consequently, the Court finds that Plaintiff has not pled facts sufficient to plausibly allege a basis for asserting a claim pursuant to the Eighth Amendment.[18]

### 3. Claim Under 42 U.S.C. § 1985

Lastly, Plaintiff has not alleged facts plausibly suggesting that a conspiracy to violate his rights existed. "To state a civil rights conspiracy under [42 U.S.C.] § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under

---

[18]     Because the Court has now found that Defendant Eaves has not committed any constitutional violations, there is no need to reach the issue of whether Defendant Birkshire can be held liable for her actions under a theory of supervisory liability; without a constitutional violation, there is nothing for a supervisor to be liable for. *See Raspardo v. Carlone*, 770 F.3d 97, 129 (2d Cir. 2014) ("Because we have held that there was no underlying constitutional violation, there is also no supervisory liability."); *accord Lawrence v. Evans*, 669 F. App'x 27, 28 (2d Cir. 2016); *Beaver v. Dippert*, 17-CV-0550, 2017 WL 3917037, at *5 (N.D.N.Y. Sept. 6, 2017) (D'Agostino, J.); *Flynn v. Ward*, 15-CV-1028, 2015 WL 8056060, at *5 (N.D.N.Y. Dec. 4, 2015) (Sharpe, J.).

the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Britt v. Garcia*, 457 F.3d 264, 270 n.4 (2d Cir. 2006). Plaintiff must also allege that (1) "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action," and (2) the conspiracy was "aimed at interfering with rights . . . protected against private, as well as official, encroachment." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68 (1993) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 [1971]).

"Vague and conclusory allegations that defendants entered into a lawful agreement will not suffice to state a conspiracy claim under either § 1983 or § 1985(3). . . . [i]nstead, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve some lawful end." *Trombley v. O'Neill*, 929 F. Supp. 2d 81, 97 (N.D.N.Y. 2013) (Suddaby, J.) (internal citations omitted). Under the intra-corporate conspiracy doctrine, "officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other." *Trombley*, 929 F. Supp. 2d at 97.

Because all the DSS Defendants are employees of the same organization, no conspiracy can be found between them based on the intra-corporate conspiracy doctrine given that Plaintiff has not offered proof that they acted outside the scope of their employment. (Dkt. No. 5, at 2-9 [Pl.'s Am. Compl.].) The only way in which Plaintiff can plausibly suggest a conspiracy is by alleging facts of a conspiracy between the DSS Defendants (whether individually or together) and the Birkshire Defendants. However, Plaintiff has not alleged any facts suggesting (much less plausibly suggesting) that an agreement existed between these Defendants to violate Plaintiff's

rights by preventing him from regaining custody of his children. Instead, he alleges merely that both the DSS Defendants and Defendant Eaves made false statements against him, without any allegation that they were acting in concert in making those statements. Plaintiff therefore has not alleged facts plausibly suggesting the existence of any conspiracy to deprive him of his rights.

Additionally, Plaintiff has not alleged facts plausibly suggesting that any conspiracy was based on his race. Plaintiff does not make any allegations in either the Amended Complaint or his opposition memorandum of law regarding his race, much less allegations that he was discriminated against on the basis of his race. Similarly, although he alleges that he is Muslim (to the extent that his religion would qualify as a class), he does not even attempt to allege that his religion was the basis for the discriminatory animus allegedly directed towards him. (Dkt. No. 5, at 13 [Pl.'s Am. Compl.].)

Because Plaintiff has not alleged facts plausibly suggesting a discriminatory conspiracy against him, any claim asserted pursuant to 42 U.S.C. § 1985(3) must also be, and is, dismissed.

### E.     Whether Plaintiff's State Law Claims Must Be Dismissed

After careful consideration, the Court answers this question in the affirmative for the following reasons.

As discussed above, Plaintiff appears to nominally assert a claim for intentional and/or negligent infliction of emotional distress. A claim of negligent infliction of emotional distress under New York law requires a plaintiff to prove four elements: (1) that he suffered emotional distress, (2) a breach of a duty, (3) that the emotional distress was caused by the defendant's breach of that duty, and (4) the breach of the duty unreasonably endangered the plaintiff's own physical safety. *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 284-85 (N.D.N.Y. 2018) (Hurd, J.)

(citing *Baker v. Dorfman*, 239 F.3d 415, 421 [2d Cir. 2000]); *see also Santana v. Leith*, 985

N.Y.S. 2d 147, 149 (N.Y. App. Div. 2d Dept 2014) (noting that, although no actual physical

injury is necessary, there must be a breach of a duty owed that either unreasonably endangers the

plaintiff's physical safety or causes the plaintiff to fear for his or her own safety); *accord, United*

*States ex rel. Rubar v. Hayner Hoyt Corp.*, 306 F. Supp. 3d 478, 485 (N.D.N.Y. 2018) (Sharpe,

J.). The duty "must be specific to the plaintiff" and "is far more specific than the more

generalized duty to avoid negligently injuring another." *Borroughs*, 325 F. Supp. 3d at 285.

A claim for intentional infliction of emotional distress under New York law also requires

the plaintiff to prove four elements: "(1) extreme and outrageous conduct; (2) intent to cause

severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe

emotional distress." *Borroughs*, 325 F. Supp. 3d at 285 (quoting *Bender v. City of New York*, 78

F.3d 787, 790 [2d Cir. 1996]).

Even construing Plaintiff's Amended Complaint liberally, he has not alleged facts

plausibly suggesting either claim. As to a claim of negligent infliction of emotional distress,

there is no indication of what specific duty Defendants owed to Plaintiff, nor any facts suggesting

that Defendants' actions breaching any such duty threatened his physical safety in any way or

caused him to reasonably fear for his physical safety. As to a claim for intentional infliction of

emotional distress, Defendants' conduct in making statements about Plaintiff, his history, and his

actions in connection with the child custody issue, without any evidence to create a genuine issue

of material fact as to whether those statements were true, is not extreme and outrageous.

For these reasons, Plaintiff's state law claims also must be, and are, dismissed.

**ACCORDINGLY**, it is

**ORDERED** that the Birkshire Defendants' motion for summary judgment (Dkt. No. 50) is **GRANTED**; and it is further

**ORDERED** that the DSS Defendants' motion for summary judgment (Dkt. No. 51) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 5) is **DISMISSED**.

Dated: August 22, 2019
        Syracuse, NY

Hon. Glenn T. Suddaby
Chief U.S. District Judge